IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Chief Judge

Criminal Case No.  04-cr-00403-B

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.    CARLOS ZAPATA-HERNANDEZ,
2.    SERGIO ZAPATA-HERNANDEZ, a/k/a "Tito", a/k/a "Titillo", a/k/a "Lucas",
3.    FABIAN MIRANDA-URBINA, a/k/a "Chino",
4.    ARNOLDO ZAPATA, a/k/a "Lolo",
5.    JOSE ALFREDO ZAPATA, a/k/a "Alfredo",
6.    JAIME ARMENDARIZ,
7.    RAMON ZAPATA,
8.    JAIME ZAPATA, a/k/a "Rudy", a/k/a "Jimmy", a/k/a "Chasco",
9.    EFRAIN VENZOR,
10.   ALBERTO CABRAL, a/k/a "Beto", a/k/a "Tio Beto",
11.   ARTEMISA ZAPATA-MONTOYA,
12.   HUMBERTO GALVAN, a/k/a "Beto",
13.   LILIAN GALVAN, a/k/a "Petunia", a/k/a "Yiya",
14.   BARBARA ZAPATA,
15.   OSCAR ZAPATA, a/k/a "Karin",
16.   MICHAEL ROMERO, a/k/a "Mike",
17.   RENE ALVAREZ,
18.   JOSE ANGEL PEREZ, a/k/a "Primo",

    Defendants.
_____

ORDER
_____

    The Government sought and obtained orders authorizing seven wire taps during its

investigation of this case.  On April 6, 2004, it applied for a wire tap ("WT-1") on telephone

number 303-710-5208, allegedly then in the possession of Carlos Zapata-Hernandez.  Also on

April 6, 2004, it applied for a tap ("WT-2") on telephone number 720-232-3127, allegedly then in

the possession of "Chino," believed to be using the alias "Francisco Duran."  On May 6, 2004, it

applied for a tap ("WT-3") on 720-233-9760, to which number "Chino" had allegedly switched.

It applied for renewals of WT-3 on June 10, 2004, July 12, 2004, and August 16, 2004.  On April

29, 2004, the Government sought a tap ("WT-4") on 303-249-5656, allegedly then in the

possession of Carlos Zapata-Hernandez.  It sought extensions of WT-4 on June 1, 2004, June 30,

2004, and August 2, 2004.  On July 15, 2004, the Government applied for wire taps on 915-892-

0830 ("WT-5"), 915-892-1145 ("WT-6"), and 915-892-1664 ("WT-7"), all allegedly subscribed

to by Arnoldo Zapata.

All of the affidavits in support of the authorization applications are detailed and

comprehensive; some comprise in excess of 60 pages.  A federal district court judge reviewed

each affidavit and issued an order authorizing the wire tap. The defendants have made no

substantial, preliminary showing that the affidavits contain intentional or reckless, material

omissions, or that the affidavits, with any omitted information included, would be insufficient to

support a finding of probable cause.  *United States v. McKissick*, 204 F.3d 1282, 1297 (10th Cir.

2000).  Indeed, they have provided no evidence along those lines and are not, therefore, entitled

to a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667

(1978).  I summarize below the substance of the various affidavits.

## I.  Facts

### A.      WT-1 and WT-2

In his April 6, 2004 affidavit, Michael Moore, Special Agent ("SA") of the Drug

Enforcement Administration ("DEA"), stated that he had been involved in the investigation of the

Zapata-Hernandez organization since its inception in March, 2002.  He identified the suspected

participants and activities of the organization.

SA Moore described the Government's investigation to that point, including the arrest of associates of the Zapata-Hernandez organization and the cooperation of informants.  He disclosed that a confidential informant had in October, 2000 advised the DEA of the organization's alleged narcotics and money-laundering activities; that informant was thereafter unable to provide current information about the organization.  He stated that Kansas highway patrol had on December 11, 2003 apprehended Kenneth Lyons and Letty Sierra de Maldonado, who were transporting 24 kilograms of cocaine, after a consensual search during a routine traffic stop.  Ms. Sierra de Maldonado's cell phone had recently been used to call Carlos Zapata-Hernandez, and records of a hotel in Denver indicated that Mr. Lyons had stayed there early on the morning of December 11, 2003.

SA Moore described a February 13, 2004 traffic stop by the Kansas highway patrol of Sofia Robertson and Jesus Mejia, whose vehicle after a consensual search yielded 12 kilograms of cocaine.  Mr. Mejia disclosed to the DEA that he had been for three years purchasing large quantities of cocaine from Carlos Zapata-Hernandez and had transported much of the drugs to the Washington, D.C. area.  Mr. Mejia described his usual arrangements with Mr. Zapata-Hernandez and his most recent purchase, with which he had been caught.  He identified Ms. Sierra de Maldonado as his mother, and stated that she was at the time of her December, 2003 arrest transporting for him drugs supplied by Mr. Zapata-Hernandez.  Mr. Mejia provided other details about Mr. Zapata-Hernandez and his alleged sales operations.

SA Moore recited that the DEA had in February, 2003 received from a paid, confidential informant information about Jose Angel Perez, who sold cocaine.  In the ensuing months, the

3

confidential informant made for the Government five controlled purchases of cocaine from Mr. Perez.  Toll records indicated that, during the controlled buys, Mr. Perez had been in telephonic communication with Francisco Duran and Sergio Zapata-Hernandez.  Mr. Perez referred to these recipients of his calls as his "source[s]."  The Government performed surveillance of Mr. Perez during this time period and witnessed a contact between him and Sergio Zapata-Hernandez immediately prior to the third buy.  Surveillance of others who contacted Mr. Perez proved fruitless, as did an attempt to introduce an undercover officer to Mr. Perez.

SA Moore relayed the results of a wire tap investigation that the DEA had performed on the telephone of Jose Jesus Aquino-Ibarra.  Conversations intercepted from that line revealed that Mr. Aquino-Ibarra was attempting to obtain narcotics from Francisco Duran and Sergio Zapata-Hernandez.  SA Moore also disclosed that pen register data revealed communications among Carlos Zapata-Hernandez, Sergio Zapata-Hernandez, Francisco Duran, and others in the Zapata-Hernandez organization.

SA Moore stated why traditional law enforcement techniques had failed, had met with limited success, reasonably appeared to be unlikely to succeed, or were too dangerous.  He explained that the goals of the investigation were: identifying the organization's source of drugs, learning the organization's practices and techniques, and identifying fully all the participants in the alleged conspiracy.

SA Moore explained why the DEA's confidential informants were not in a position to provide the information sought.  He stated that Carlos Zapata-Hernandez had demonstrated a reluctance to do business with unknown persons and that the organization consisted of "close knit family members who tend to deal amongst themselves."  So, for those reasons, attempts to

introduce cooperating sources into the organization would prove dangerous.  He knew of no potential cooperating sources who might infiltrate the organization.  Similarly, witness interviews had provided little information about the extent and practices of the organization.  The use of grand jury subpoenas, he said, was unlikely to produce pertinent information and would only compromise the investigation because it would require immunization of the most culpable members of the alleged conspiracy.

SA Moore attested that surveillance of Carlos Zapata-Hernandez, Sergio Zapata-Hernandez, Jose Angel Perez, Francisco Duran, and others in the organization had met with limited success.  He opined, based upon his observations, that members of the organization were "extremely surveillance conscious," communicated their suspicions to each other, and lived in affluent neighborhoods where surveillance was difficult.  He recited specific instances in which members of the organization had either spotted or evaded surveilling officers.

SA Moore averred that the Government had considered and rejected the idea of executing a search warrant at the home of Carlos Zapata-Hernandez.  He asserted that the DEA had limited information about inculpatory evidence in the Carlos Zapata-Hernandez home and had reason to believe that such evidence was not kept in the home for extended periods of time; an ill-timed warrant execution would accomplish nothing except alerting the organization to the investigation. The Government decided not to execute warrants at the homes of other members of the organization for similar reasons.

SA Moore stated that the use of pen registers and toll records had not resulted in the requisite information.  Six confiscations of trash had produced no useful evidence.  Examination of public records had provided useful corroboration of informants' statements, but yielded no

relevant, inculpatory information.  The wire tap on Jose Jesus Aquino-Ibarra's phone had

produced little information because Mr. Aquino-Ibarra turned out to occupy a low-level position

within the organization and had limited access to decision-makers.

**B.      WT-3 – May 6, 2004 affidavit**

In his May 6, 2004 affidavit, SA Michael Tonozzi of the DEA stated that, after detecting

surveillance on April 10, 2004, Carlos Zapata-Hernandez had discontinued use of the telephone

number that was subject to WT-1 and had advised his associates to change their numbers.  Shortly

thereafter, Chino changed his number from 720-232-3127 to 720-233-9760.

SA Tonozzi recited the contents of calls intercepted with WT-2, which demonstrated

Chino's participation in drug trafficking activities and his involvement with members of the

Zapata-Hernandez organization.  He repeated many of the assertions contained within SA

Moore's April 6 affidavit concerning attempts at traditional law enforcement techniques.  He

stated additionally that surveillance since April 6 had enabled officers to identify some alleged

conspirators.  However, he advised that, since members of the organization had observed

surveilling officers on April 10, they had become more wary of surveillance.  On April 25, 2005,

an unknown person had called Chino and informed him of the presence of surveillance officers at

a planned rendevous location.  Trash grabs had become more dangerous because the alleged

conspirators were on heightened alert.

**C.      WT-3 – applications for renewal**

In his June 10, 2004, July 12, 2004, and August 16, 2004 affidavits, SA Tonozzi repeated

and incorporated much of the information contained in prior affidavits and summarized additional

communications intercepted from Chino's phone, which implicated him and other members of the

Zapata-Hernandez organization in drug trafficking.  He indicated, however, that the intercepted communications had not revealed the full extent or practices of the organization.  For example, Chino did not appear from intercepted conversations to know the source of the drugs or the terminus of incoming shipments.

SA Tonozzi reiterated the grounds on which he believed that continuation of WT-3 was necessary.  The affidavit demonstrates that, as time progressed, members of the Zapata-Hernandez organization became more wary of law enforcement surveillance and behaved with increasing caution.  SA Tonozzi averred that Chino had moved from his residence after law enforcement officers were detected in the area and that Carlos Zapata-Hernandez had delayed shipments of cocaine for fear of detection by police.

In his June 10, 2004 affidavit, SA Tonozzi indicated that the Government intended to interview a newly-acquired confidential informant, designated Confidential Informant 3 ("CI-3"). However, he advised that members of the Zapata-Hernandez organization were aware of CI-3's recent arrest and were likely to view the informant with suspicion.  In his July 12, 2004 affidavit, he relayed CI-3's assertion that CI-3 had not had contact with the Zapata-Hernandez organization since November, 2003, a claim that pen registers proved untruthful.  So, SA Tonozzi determined not to work with CI-3.

It is not entirely clear from the August 16, 2004 affidavit whether the DEA knew the identities of all alleged conspirators at that time.  SA Tonozzi averred that Carlos and Barbara Zapata-Hernandez were at that time in Mexico, that the organization in Colorado was awaiting a shipment, and that the DEA intended to make arrests once Carlos, Barbara, and the shipment arrived in the Denver area.  However, he also indicated that the DEA was trying to ascertain the

7

identities of conspirators working in the El Paso, Texas area.  And several of the alleged

conspirators were listed in the affidavit without their surnames, which SA Tonozzi described as

unknown.  In any event, SA Tonozzi averred that the Government did not know the identities of

all conspirators.  Also, the Government did not then know where it might find inculpatory

evidence when executing search warrants.

### D.     WT-4

In his April 29, 2004 affidavit, SA Moore repeated and incorporated much of the

information contained in prior affidavits and reiterated that Carlos Zapata-Hernandez had changed

his phone number after detecting surveillance earlier that month.  He recited the contents of calls

intercepted with WT-1 and the results of surveillance, which indicated that Mr. Zapata-Hernandez

and his wife, Barbara, were engaged in drug trafficking.  Pen register data indicated that Mr.

Zapata-Hernandez was using his new telephone number to contact the same alleged co-

conspirators as those to whom he had talked using the old number.

SA Moore repeated many of the assertions contained within prior affidavits concerning the

DEA's attempts at traditional law enforcement techniques.  He asserted that WT-1 had operated

for too brief a period of time to yield the identities and practices of the alleged conspirators.

In subsequent affidavits submitted on June 1, 2004, June 30, 2004, and August 2, 2004,

SA Moore summarized additional communications intercepted from Carlos Zapata-Hernandez's

phone, which implicated him and other members of the Zapata-Hernandez organization in drug

trafficking.  He reiterated that the alleged conspirators were increasingly wary of onlookers and

had begun to transact business in a remote location that was not susceptible to surveillance.  Also,

trash grabs had become impracticable because of the targets' vigilance.  SA Moore opined that

continuation of the wire tap was necessary because the Government did not yet know the identities of the sources of supply, the locations of stash houses, the methods of importation, or the full scope of the operation. He recited intercepted references to participants in the operation whom the DEA had not yet identified.

### E. WT-5, WT-6, and WT-7

SA Tonozzi incorporated in his July 15, 2004 affidavit the information contained in prior affidavits and the contents of communications intercepted to that point in time. He averred that the DEA could not then identify the sources of narcotics to the Zapata-Hernandez organization, but that one anonymous source was believed to travel with some frequency to Texas to meet with Arnoldo Zapata and Jose Alfredo Zapata, relatives of Carlos Zapata-Hernandez whose roles in the organization were then unknown. SA Tonozzi anticipated that wire taps on Arnoldo Zapata's phones would reveal the methods of storage and transport that the organization allegedly employed. He stated that traditional law enforcement techniques had been unsuccessful at obtaining this information, due to the issues explained above. He asserted that the information was crucial to the efficacious execution of search warrants. Prior and existing wire taps had not yielded that information.

## II. Discussion

### A. Joint Motion

The defendants have filed a joint motion challenging the necessity for the wire tap orders. They assert that, before applying for the wire tap authorizations, the Government had obtained evidence against them utilizing traditional law enforcement mechanisms. They point out that the Government had seized drugs that Mr. Mejia had purchased from the organization, had performed

controlled buys, and had received information from two informants.  They assert that the Government had also infiltrated the organization through an undercover agent, though that does not appear in the affidavits, or in any exhibits to their motion.  They argue that the Government's investigative success would have continued without the assistance of wire taps.

The Government responds that the DEA did not by traditional law enforcement methods succeed in attaining the goals of the investigation, which included identification of the various alleged members of the conspiracy, their methods, and the times and locations of importation into Colorado.  It asserts that the objective of the investigation was not simply to arrest Carlos Zapata-Hernandez but rather to dismantle the entire organization, including suppliers, distributers, importers, and couriers.  It states that traditional tools proved ineffectual in pursuit of that objective.  It points out that Special Agents Moore and Tonozzi described and explained in their affidavits these deficiencies of traditional law enforcement tools.

Wiretap authorization orders are presumed proper and the defendants bear the burden of overcoming this presumption.  *United States v. Mitchell*, 274 F.3d 1307, 1310 (10th Cir. 2001).  Thus, the defendants must present a *prima facie* showing that the Government failed to satisfy the requirements of 18 U.S.C. § 2518, which governs wire tap authorizations, and that the orders authorizing the taps were illegal.  *United States v. Borrayo-Gutierrez*, 119 F. Supp. 2d 1168, 1170 (D. Colo. 2000), *aff'd sub nom.*, *United States v. Ramirez-Encarnacion*, 291 F.3d 1219 (10th Cir. 2002).

The judge to whom the application for a wiretap is submitted is vested with considerable discretion in her analysis.  *United States v. Carrillo*, 123 F. Supp. 2d 1223, 1231 (D. Colo. 2000).  A district court examines *de novo* whether a full and complete statement was submitted to the

issuing judge and reviews for an abuse of discretion the issuing judge's conclusion that the

wiretaps were necessary. *United States v. Merton*, 274 F. Supp. 2d 1156, 1166 (D. Colo. 2003).

An affidavit in support of an application for a wire tap order must demonstrate, *inter alia*,

that "normal investigative procedures have been tried and have failed or reasonably appear to be

unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c) & (3)(c). This

necessity requirement is distinct from the probable cause requirement of 18 U.S.C. § 2518(3)(a)

& (b). Its purpose is "to ensure that the relatively intrusive device of wiretapping 'is not resorted

to in situations where traditional investigative techniques would suffice to expose the crime.'"

*Mitchell*, 274 F.3d at 1309 (quoting *United States v. Castillo-Garcia*, 117 F.3d 1179, 1185 (10th

Cir. 1997), *cert. denied sub nom.*, *Armendariz-Amaya v. United States*, 522 U.S. 962, 118 S. Ct.

395, 139 L. Ed. 2d 309 (1997)).

Traditional law enforcement techniques include:

> (1) standard visual and aural surveillance; (2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); (3) use of search warrants; and (4) infiltration of conspiratorial groups by undercover agents or informants.

*Mitchell*, 274 F.3d at 1310. The affiant must explain with particularity abstinence from

employment of any of those four procedures. "In addition, if other normal investigative

techniques such as pen registers or trap and trace devices have not been tried, a similar

explanation must be offered as to why they also would be unsuccessful or too dangerous." *Id*.

However, the burden on the Government is not great, and the adequacy of the Government's

showing is to be tested in a practical and commonsense fashion. *United States v. Nunez*, 877 F.2d

1470, 1472 (10th Cir. 1989); *United States v. Oriakhi*, 57 F.3d 1290, 1298 (4th Cir. 1995), *cert.*

*denied*, 516 U.S. 952, 116 S. Ct. 400, 133 L. Ed. 2d 319 (1995).

"[T]he necessity requirement does not demand that every conceivable method of investigation has been tried and has failed or that other steps could have been taken." *United States v. Armendariz*, 922 F.2d 602, 607 (10th Cir. 1990), *reh'g denied*, (1991), *cert. denied sub nom.*, *Aguirre v. United States*, 502 U.S. 823, 112 S. Ct. 87, 116 L. Ed. 2d 59 (1991). It is not an exhaustion requirement. *Castillo-Garcia*, 117 F.3d at 1187. Necessity is proven by demonstration that continuation of traditional tactics previously employed would prove impracticable or ineffectual. *United States v. Apodaca*, 820 F.2d 348, 350 (10th Cir. 1987), *cert. denied*, 484 U.S. 903, 108 S. Ct. 245, 98 L. Ed. 2d 202 (1987). Indeed, "the government may obtain a wiretapping warrant without trying *any* other methods of investigation, if it demonstrates that normal investigatory techniques reasonably appear to be unlikely to succeed if tried, or to be too dangerous to try." *Castillo-Garcia*, 117 F.3d at 1187 (emphasis original).

The Government characterizes the affidavits correctly. From the affidavits it is clear that the DEA employed traditional investigative techniques with limited success; that the Zapata-Hernandez organization was insular, sophisticated, complex, and multi-faceted; that members of the organization adeptly detected and evaded surveilling officers; and that the Government did not know until some time after August 16, 2004 the full extent of the organization or the location where drugs might be found during execution of a search warrant.

The Tenth Circuit has held that determination of the dimensions of a narcotics conspiracy and identification of the source of drugs are legitimate investigatory goals necessitating employment of wire taps for the purposes of 18 U.S.C. § 2518. *United States v. Newman*, 733 F.2d 1395, 1399 (10th Cir. 1984). Law enforcement personnel are properly concerned with

identifying all of the members of a conspiracy and the precise nature and scope of illegal activity, and may utilize electronic surveillance toward those ends when traditional techniques fail. *United States v. Johnson*, 645 F.2d 865, 867 (10th Cir. 1981), *cert. denied sub nom.*, *Abiledinger v. United States*, 454 U.S. 866, 102 S. Ct. 329, 70 L. Ed. 2d 168 (1981); *United States v. Mesa-Rincon*, 911 F.2d 1433, 1443-1444 (10th Cir. 1990). Upon my four-corners, *de novo* review of the affidavits, I find and conclude that a full and complete statement of necessity was submitted to the issuing judge and discern no abuse of discretion in the issuing judge's conclusion in each instance that the wiretaps were necessary. *Ramirez-Encarnacion*, 291 F.3d at 1222 n.1, 1223; *Merton*, 274 F. Supp. 2d at 1166 . Necessity thus appears in the affidavits and the Government has satisfied the requirements of 18 U.S.C. § 2518(1)(c) & (3)(c).

**B.     Carlos Zapata Hernandez's Supplemental Motions to Suppress**

**I.     April 6, 2004 application**

Carlos Zapata-Hernandez moves to suppress communications intercepted through WT-1 on the ground that the Government had, before the issuance of wire tap authorizations, "more than sufficient evidence to charge" him with drug trafficking offenses. He cites *Castillo-Garcia*, 117 F.3d at 1188, for the proposition that the Government must explain with particularity its attempts to use less intrusive methods.

Mr. Zapata-Hernandez faults the Government for: making insufficient attempts to introduce informants and the undercover agent into the organization; speculating that grand jury subpoenas would be ineffective; failing to interview members of the organization; failing to arrest members of the organization; failing to execute search warrants; and failing to search his trash.

The Government points out, and I agree, that the affidavits contain detailed descriptions

of: why the informants were incapable of providing the requisite information; in what ways the

Zapata-Hernandez organization demonstrated its resistance to outsiders; the paucity of Mr.

Mejia's and other witnesses' knowledge about the organization's sources and internal practices;

the insufficiency of phone records and trap and trace devices; the grounds for the Special Agents'

belief that convening a grand jury would be ineffectual; and the failure to obtain inculpatory

evidence from trash grabs.  Also, the Government reiterates correctly that the goal of the

investigation was to disable the entire organization, not merely to arrest Mr. Zapata-Hernandez.

As a matter of fact, Mr. Zapata-Hernandez overstates the strength of the Government's

case prior to the wire tap authorizations and mischaracterizes the contents of the affidavits.  Much

of the evidence linking him to Mr. Perez and other alleged co-conspirators came only through the

wire taps, and was not accessible to the Government via traditional law enforcement tools.  And,

as explained above, the affidavits presented detailed descriptions of the obstacles the DEA

encountered prior to the authorizations and explanations of the DEA's failures successfully to

utilize traditional methods to meet the goals of the investigation.  Among these explanations were

that the informants had little information about the inner workings of the organization and that

any technique that alerted members of the organization to the investigation would likely make

further investigation impossible.

As a matter of law, Mr. Zapata-Hernandez misapprehends the Government's burden.  The

Government was not required to cease its investigation once it possessed evidence on which it

could indict some members of the organization.  Rather, it permissibly conducted surveillance of

known participants in order to learn the identities of co-conspirators.  *Johnson*, 645 F.2d at 867.

And Mr. Zapata-Hernandez's post-facto speculation that members of the organization would have

cooperated with the DEA is the sort of second-guessing in which courts of this Circuit do not indulge. *Carrillo*, 123 F. Supp. 2d at 1245.

Mr. Zapata-Hernandez asserts conclusorily that the Government failed to minimize the interceptions. He does not argue the point in his brief and provides no facts in support of the claim. Nevertheless, the Government responds by detailing the steps it affirmatively took to minimize intrusions. The Government provides an April 5, 2004 memorandum from Assistant United States Attorney ("AUSA") Stephanie Podolak addressed to "Monitoring Agents," in which AUSA Podolak instructs all agents to read the affidavit, application, order, and the memorandum and to sign the memorandum before monitoring. The memorandum bears the signatures, promising compliance, of fourteen agents. It admonishes agents generally to monitor only to the extent necessary and specifically to avoid monitoring privileged communications and conversations that do not clearly concern criminal activity. It contains instructions for minimizing translations of conversations after interception and requires that any non-agent translators be supervised by federal agents.

The Government invokes the Tenth Circuit's framework for evaluating minimization efforts under 18 U.S.C. 2518(5), which appears in *United States v. Willis*, 890 F.2d 1099 (10th Cir. 1989). There the court explained, "The starting point for review of the adequacy of minimization efforts is an examination of the reasonableness of the agents' efforts to refrain from monitoring conversations deemed non-pertinent to the investigation." *Willis*, 890 F.2d at 1101. The court first examines the general efforts made on each wire tap, then looks at the particular efforts made for each defendant with standing to challenge the intrusion. *Id*. The Government must first make a prima facie showing of reasonable minimization. *Id*. at 1102. The burden then

shifts to Mr. Zapata Hernandez to show that the Government could have engaged in more effective minimization. *Id.*

The *Willis* court endorsed efforts by law enforcement in that case that resulted in 70% minimization, after pertinent calls, non-pertinent calls lasting less than two minutes, and misdialed calls were subtracted. *Willis*, 890 F.2d at 1102. Also, the court gives officers more leeway at the beginning of an investigation, when they are trying to learn the code words of the organization, the identities of speakers, and the significance of conversations. *Id.*

Here, the Government shows the following. During the first 30 days of WT-1, 108 interceptions produced only three complete, non-pertinent calls lasting more than two minutes, of which one was minimized. During the first 30 days of WT-2, 514 interceptions resulted in nineteen complete, non-pertinent calls lasting more than two minutes, of which thirteen were minimized.

The Government's efforts were sufficient within the *Willis* framework. WT-1 and WT-2 were the first wire taps and agents were, during those interceptions, familiarizing themselves with the Zapata-Hernandez organization. Also, the number of non-pertinent calls longer than two minutes is very small compared with the number of interceptions. *See*, *Merton*, 274 F. Supp. 2d at 1195. Finally, Mr. Zapata-Hernandez has identified no additional minimization efforts that the Government might have undertaken and has not argued that the minimization efforts were unreasonable as to his communications, specifically. *Willis*, 890 F.2d at 1102.

16

### ii.      April 29, 2004 application

Mr. Zapata-Hernandez moves to suppress communications intercepted through WT-4 on the ground that, on April 22, 2004, law enforcement officers found his fingerprints on a shipment of drugs seized in Kansas and then had probable cause to arrest him for drug trafficking.  The Government disputes that recitation of fact, claiming that the prints were not identified until May 7, 2004.  The factual dispute is not material.  Mr. Zapata-Hernandez has not produced evidence entitling him to a *Franks* hearing and, in any event, as explained above, his arrest was not the only goal of the investigation.

Mr. Zapata-Hernandez characterizes the affiants' stated decisions not to pursue further interviews with informants as "conclusory."  However, the Special Agents disclosed in their affidavits the reasons for their decisions, which included the lack of pertinent knowledge of two informants and the demonstrable falsity of CI-3.  Additionally, Mr. Zapata-Hernandez faults the Government for not performing surveillance in El Paso, Texas.  However, he provides no evidence that the Government knew, prior to April 29, 2004, whom or what locations in El Paso to monitor.

The Government avers that 507 interceptions during the first 30 days of WT-4 resulted in 32 non-pertinent calls longer than two minutes.  Of these, 21 were minimized.  These efforts were sufficient within the *Willis* framework.

### iii.     May 6, 2004 application

Mr. Zapata-Hernandez moves to suppress communications intercepted through WT-3 on the ground that his detection of surveillance, as reported in the affidavits, did not rule out continued surveillance.  The Government points out that the May 6, 2004 affidavit contains

specific references to recent surveillance and its fruits.  Indeed, Mr. Zapata-Hernandez misapprehends the contents of the affidavits, in which the Special Agents reported that they were continuing surveillance but that the practice was proving only marginally effective because of the increased caution of Mr. Zapata-Hernandez and others in the organization.

Mr. Zapata-Hernandez again faults the Government for not executing search warrants. However, he does not address the Special Agents' concern, repeated throughout the affidavits, that execution of a search warrant at one of the defendants' homes would have alerted the entire organization to the investigation and made continued investigation impracticable.  He argues that the DEA should have obtained a trash truck in order to collect trash at all of the target locations without detection.  This creative suggestion does not cast doubt upon the necessity demonstration in the affidavits; the Government is not required to exhaust the gambits that counsel can imagine after the fact.

The Government avers that 413 interceptions during the first 30 days of WT-3 resulted in 42 non-pertinent calls longer than two minutes.  Of these, 36, or 85.7%, were minimized.  These efforts were sufficient within the *Willis* framework.

### iv.    June 1, 2004 application

Mr. Zapata-Hernandez moves to suppress communications intercepted through the June 1, 2004 renewal of WT-4 on the ground that the DEA did not conduct a trash run at 919 South Raleigh Street in Denver, where members of the organization were known to meet.  The Government points out that, as reported in the affidavits, SA Moore did, in fact, confiscate trash discarded by Mr. Zapata-Hernandez at that location and found no inculpatory evidence.

The Government avers that 623 interceptions during this period of WT-4 resulted in 55

18

non-pertinent calls longer than two minutes.  Of these, 47, or 85.5%, were minimized.  These efforts were sufficient within the *Willis* framework.

### v.    June 10, 2004 application

Mr. Zapata-Hernandez moves to suppress communications intercepted through the June 10, 2004 renewal of WT-3 on the ground that the Government failed to utilize CI-3.  In response, the Government points to SA Tonozzi's detailed description of the attempts to interview CI-3 and CI-3's prevarication, which led SA Tonozzi to conclude that CI-3 could not be trusted.  Mr. Zapata-Hernandez argues that the Government should have proceeded with the interview anyway. No authority appears for that proposition.

Mr. Zapata-Hernandez faults the Government for failing to conduct surveillance of him when he traveled to Phoenix and for failing to conduct surveillance of Chino after Chino was alerted to the presence of law enforcement.  These criticisms amount to *post facto* second-guessing.

The Government avers that 700 interceptions during this period of WT-3 resulted in 40 non-pertinent calls longer than two minutes.  Of these, 34, or 85%, were minimized.  These efforts were sufficient within the *Willis* framework.

### vi.    June 30, 2004 application

In his motion to suppress communications intercepted through the June 30, 2004 renewal of WT-4, Mr. Zapata-Hernandez repeats arguments dealt with above.  He adds that the Government had on June 30 information that a shipment of narcotics was destined for El Paso from Mexico.  The Government points out that SA Moore explained why the DEA did not attempt surveillance in Texas or Colorado at that time; the organization had suspended operations

because its members had recently detected surveilling officers.

The Government avers that 530 interceptions during this period of WT-4 resulted in 38 non-pertinent calls longer than two minutes.  Of these, 36, or 94.7%, were minimized.  These efforts were sufficient within the *Willis* framework.

### vii.     July 12, 2004 application

In his motion to suppress communications intercepted through the July 12, 2004 renewal of WT-3, Mr. Zapata-Hernandez repeats arguments already discussed.  The Government avers that 642 interceptions during this period of WT-3 resulted in 40 non-pertinent calls longer than two minutes.  Of these, 36, or 90%, were minimized.  These efforts were sufficient within the *Willis* framework.

### viii.    July 15, 2004 application

In his motion to suppress communications intercepted through WT-5, WT-6, and WT-7, Mr. Zapata-Hernandez repeats arguments already discussed.  He adds that the Government knew, as of July 15, 2004, that Arnoldo Zapata resided in El Paso but did not attempt surveillance of him there.  The Government responds by pointing out SA Tonozzi's explanation in the affidavit: the DEA had by this time switched from in-person to closed-circuit television surveillance because of the organization's heightened sensitivity to the presence of law enforcement.  The Government asserts that it was not practicable to place television surveillance equipment at more than the residences of the three highest ranking members of the organization.

The Government avers that 250 interceptions during WT-5, WT-6, and WT-7 resulted in 6 non-pertinent calls longer than two minutes.  Of these, 3 were minimized.  The Government asserts that it encountered problems minimizing calls on these telephones because users frequently

employed the push-to-talk, or walkie-talkie functions of the phones being monitored.  As a result,

agents were able to intercept only one side of the conversations.  The Government's efforts were

sufficient within the *Willis* framework.

### ix.	August 2, 2004 application

In his motion to suppress communications intercepted through the August 2, 2004

renewal of WT-4, Mr. Zapata-Hernandez repeats arguments already discussed.  He adds that the

Government by August 2 knew that the organization was conducting business at Mendoza's Used

Bricks.  He faults the Government for not searching the property or grabbing trash from that

location.  The Government points out that SA Moore in his affidavit expressly disclaimed that the

Government had confirmed that the alleged conspirators were meeting at Mendoza's Used Bricks;

the organization's heightened sensitivity to surveillance prevented visual confirmation of the

location of these meetings.

The Government avers that 492 interceptions during this period of WT-4 resulted in 26

non-pertinent calls longer than two minutes.  Of these, 25, or 96.2%, were minimized.  These

efforts were sufficient within the *Willis* framework.

### x.	August 16, 2004 application

In his motion to suppress communications intercepted through the August 16, 2004

renewal of WT-3, Mr. Zapata-Hernandez asserts that the Government had by August 16

identified Humberto Galvan as a member of the purported conspiracy.  He argues that the DEA

should have conducted surveillance of Mr. Galvan and confiscated his trash.  However, as the

Government points out in response, SA Moore dealt with this issue in detail in his affidavit.  The

DEA decided not to approach any members of the conspiracy until after Carlos and Barbara

Zapata-Hernandez returned from Mexico; the Special Agents feared that the Zapata-Hernandezes would not return to the United States if they learned of the investigation.

The Government avers that 330 interceptions during this period of WT-3 resulted in 25 non-pertinent calls longer than two minutes. Of these, 19, or 76%, were minimized. These efforts were sufficient within the *Willis* framework.

### C.  Arnoldo Zapata's Supplemental Motion to Suppress

Arnoldo Zapata argues that the Government was required to demonstrate in its affidavits not that electronic surveillance was necessary to gain information about the conspiracy but rather that it was necessary to gain information about each individual defendant, including him. He argues that the Government should have made separate showings for each defendant, demonstrating in each instance that traditional investigative techniques failed to produce sufficient probable cause to arrest that defendant. He asserts that the affidavits contain no evidence of attempts to infiltrate or observe the activities of the organization in El Paso, Texas.

No authority appears for this argument. Mr. Zapata cites dicta from *Castillo-Garcia* that "[t]he statements must be factual in nature and they must specifically relate to the individuals targeted by the wiretap." *Id*. at 1188. That court did not say, much less rule, that a showing of necessity must be made for each individual defendant. Mr. Zapata's argument runs counter to the statute, which requires a single demonstration of necessity, and to Tenth Circuit decisions, which have expressly condoned the authorization of wire taps when probable cause exists to arrest an individual but investigation remains to be performed into other aspects of the alleged conspiracy. *See*, *e.g.*, *Johnson*, 645 F.2d at 867.

22

Indeed, this Court has before rejected the argument that the Government must demonstrate necessity as to each individual defendant. *Carrillo*, 123 F. Supp. 2d at 1250. As this Court has noted, "At the time of a wiretap application, investigators do not know the identities of all the participants or their roles in a drug organization." *Id.* To require individualized showings of necessity would thus be "contrary to a practical and common-sense analysis of the necessity requirement" and to "the court's duty to consider an affidavit as a whole and assess the showing of necessity under the totality of the circumstances." *Id.* Thus, the Government may permissibly target the organization as a whole and may demonstrate necessity as to the entire conspiracy, rather than its individual members. *United States v. Bovie*, 120 F.3d 271, 1997 WL 423114 (10th Cir. 1997) (unpublished), *cert. denied*, 522 U.S. 1007, 118 S. Ct. 585, 139 L. Ed. 2d 422 (1997); *United States v. Crumpton*, 54 F. Supp. 2d 986, 1007 (D. Colo. 1999). *See also*, *United States v. Killingsworth*, 117 F.3d 1159, 1165 (10th Cir. 1997), *cert. denied*, 522 U.S. 961, 118 S. Ct. 393, 139 L. Ed. 2d 307 (1997).

Accordingly, it is ORDERED that:

1) the motions to suppress intercepted communications [Docket Numbers 556, 581, 586, 587, 588, 589, 590, 591, 592, 593, 594, 595, 596] are DENIED;

2) defendants shall file any severance motions on or before **April 19, 2006** and the Government shall file responses on or before **April 27, 2006**;

3) the Court will hear arguments on any severance motions on **May 5, 2006 at 2:00 P.M.**;

4) the Government shall, on or before **May 5, 2006**, provide to the Court and to counsel preliminary versions of its anticipated witness list, exhibit list, jury instructions, and shall provide transcripts of intercepted communications that it intends to offer into evidence at trial;

5) a preliminary trial preparation conference shall occur on **May 12, 2006 at 3:00 P.M.**; and

6) trial shall commence on **August 14, 2006 at 8:30 A.M.**.

Dated: April __11__, 2006, in Denver, Colorado.

BY THE COURT:

__s/Lewis T. Babcock_____
Lewis T. Babcock, Chief Judge